# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID NADOLSKI,

    Plaintiff,

v.

ASSOCIATES IN SLEEP MEDICINE, INC.,

    Defendant.

No. 14 C 1294

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

David Nadolski alleges that he has Attention Deficit Hyperactivity Disorder ("ADHD") and that this condition qualifies as a disability for purposes of the Americans with Disabilities Act, 42 U.S.C. § 12101-213 ("ADA"). Nadolski also alleges that his former employer, Associates in Sleep Medicine, Inc. ("ASM"), violated the ADA by failing to accommodate his ADHD and firing him because of his ADHD. R. 26. ASM has moved for summary judgment. R. 27. For the following reasons, ASM's motion is granted.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013).

To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

### I. ADHD

In 1995, when he was 17 years old, Nadolski was diagnosed with mild ADHD. R. 42 ¶ 1. Nadolski states in an affidavit submitted in opposition to ASM's motion that he has been treated by doctors for his ADHD since his diagnosis. R. 34-6 ¶ 3. On January 21, 2012, he was evaluated by nurse Margaret Hahn on a referral from Dr. Maureen McNichols. *Id.* ¶ 6. The record does not include any documents or testimony directly from Dr. McNichols, and does not reveal her qualifications. Nurse Hahn diagnosed Nadolski with ADHD. *See* R. 34-8 at 3.

Nadolski briefly took Ritalin upon his initial diagnosis, took the pharmaceutical Strattera from 2005-06, and has taken the pharmaceutical Concentra since February 2012. *See* R. 34-8 at 2. Nadolski testified that his medication generally begins to wear off around 5:00 p.m., and his ability to concentrate and perform detail-orientated tasks decreases as the evening progresses. *See* R. 28-1 at 290 (12:5-22); *see also* R. 34-6 ¶ 5.

## II. Responsibilities at ASM

Nadolski was employed by ASM from April 24, 2012 to May 24, 2013. R. 28 ¶ 15; R. 34 ¶ 15. ASM evaluates sleep disorders, and seeks patient referrals from doctors. R. 28 ¶ 1; R. 34 ¶ 1. As a "Patient Care Coordinator," Nadolski was responsible for marketing ASM's services to doctors in a certain geographic area. R. 28 ¶ 15; R. 34 ¶ 15. In this role, Nadolski was expected to travel to doctors' offices in his territory, often meeting with them over lunch. R. 28 ¶ 15; R. 34 ¶ 15. Nadolski was required to log these doctor visits in ASM's database, and to submit expense and mileage reports to ASM staff. R. 28 ¶¶ 21-22; R. 34 ¶¶ 21-22. Nadolski received training in use of the database and understood how to enter this data. R. 28 ¶¶ 18-20; R. 34 ¶¶ 18-20. Nadolski and other Patient Care Coordinators were expected to log their activities on a daily basis, with a final weekly deadline of Monday at 8:00 p.m., *see* R. 28 ¶ 7; R. 34 ¶ 7, and to log their expenses monthly. R. 28 ¶ 22; R. 34 ¶ 22. Nadolski was responsible for setting his own schedule of visits with doctors in his territory and determining when to log his activities in ASM's database. R. 28 ¶¶ 23-24; R. 34 ¶¶ 23-24. Nadolski's employment agreement provided that he was expected to work a "minimum of 40 hours per week." R. 34-6 ¶ 9.

## III. Untimely Data Entry

Despite having the freedom to set his own schedule, it was Nadolski's practice to log all of his activity for a week at the very end of the weekly reporting period, after 5:00 p.m. on Mondays. *See* R. 28-1 at 399 (in an email to his supervisor, Nadolski stated, "I typically set aside time on Monday to get everything together.").

3

This habit frequently caused Nadolski's reports to be late. Although Nadolski's performance reviews were otherwise good, the reviews noted that Nadolski was failing to ensure that he timely logged his activity in accordance with ASM policy. *See* R. 39 at 6 (in his performance review of July 27, 2012, Nadolski "freely admitted that he needs to focus more on getting [the database] updated in a timely manner"); R. 40 at 4 (Nadolski's performance review of March 13, 2013 notes that he "needs to focus more attention to completing expense reports and getting [the database] updated in a timely manner in accordance with [ASM] policies."). ASM staff also frequently informed Nadolski that he was behind in submitting his expense and mileage reports. *See* R. 28-1 at 402 (Oct. 9-11, 2012); *id.* at 407 (Dec. 10-11, 2012); *id.* at 377 (Feb. 12, 2013); *id.* at 380 (Feb. 19, 2013); *id.* at 411 (Feb. 28, 2013); *id.* at 382 (Feb. 28, 2013); *id.* at 385 (Mar. 5, 2013); *id.* at 388 (Apr. 9, 2013); *id.* at 398 (May 14, 2013). ASM issued a written warning to Nadolski about his failure to file timely expense reports on December 10, 2012, threatening him with possible termination if he failed to comply. *See* R. 28-1 at 409.

Nadolski testified that he was aware of at least one other Patient Care Coordinator who was able to timely log her activities by doing so immediately after meeting with doctors, often while sitting in her car in the doctors' parking lots. *See* R. 28-1 at 246 (118:14–121:7). Nadolski, however, testified that there were too many distractions in parking lots, such as "cars and lights," that prevented him from logging his activity under such circumstances. *Id.* (119:1-4; 119:22–120:2). In testimony somewhat to the contrary, however, Nadolski also stated that he was able

to record notes about his meetings by hand immediately following the meetings. *Id.* (121:1-7).

Nadolski attributes his difficulty in timely logging his activity to his ADHD. He testified that since his medication begins to wear off after 5:00 p.m. it was very difficult for him to log his activity by the 8:00 p.m. deadline. *See* R. 28-1 at 290 (12:15-22). Nadolski testified that Long knew that Nadolski had ADHD when he was hired. *See* R. 28-1 at 227 (44:24–45:8). Long testified that he first learned of Nadolski's condition in November 2012, *see* R. 28-1 at 79 (78:3-7), but that Nadolski never claimed that his ADHD was the reason for his late-filed activity reports. *See* R. 28-1 at 97 (96:3-5), 135 (134:5–136:1); *see also* R. 28-1 at 253 (147:18–150:5).

On February 28, 2013, Long sent Nadolski an email noting that he had not been updating the database as expected and requesting an explanation. R. 28-1 at 382. Nadolski responded by emailing Long a copy of a personality profile report created by the Dale Carnegie organization when Nadolski was employed there, which states that Nadolski did not have a detail-oriented personality. *Id.*; *see id.* at 353-75. Nadolski did not mention ADHD in this email exchange. *Id.* at 382-83. Nadolski testified, however, that in a subsequent conversation he told Long that his ADHD made it "difficult for me to get things in by [8:00] p.m. on Monday night," R. 28-1 at 253 (148:18-19), and requested an extension to 8:00 a.m. on Tuesdays, to which Long agreed. *Id.* at 253-54 (147:18–150:5). Nadolski also testified regarding this conversation, however, that he did not "know whether I was talking about

ADHD directly or if it was the symptoms." *Id.* at 254 (150:2-3). Long testified that he never extended Nadolski's weekly deadline. R. 28-1 at 132 (131:4-8).

Long also testified that the only other Patient Care Coordinator to struggle with timely database entry was Scott Sobczak. Long testified, however, that he alerted Sobczak to this problem and Sobczak entered information in a timely manner from then on. *See* R. 28-1 at 118-19 (117:22–118:2) ("Q. Did you put Scott on a written warning? A. Nope. Q. Why not? A. Because Scott did what I asked him to do."); *see also id.* at 117-19 (116:3–118:9).

## IV. Other Issues Concerning Nadolski's Job Performance

In addition to logging their daily activities, Nadolski and the other Patient Care Coordinators were also expected to update information in the database about doctors in their respective territories. R. 28 ¶ 54; R. 34 ¶ 54. Long testified that Nadolski consistently failed to adequately perform this task. According to Long's testimony, Nadolski and the other Patient Care Coordinators were expected to begin updating this information in the summer 2012. *See* R. 28-1 at 119 (118:10-21). Long testified that other Patient Care Coordinators were able to complete their updates by the end of 2012. *See id.* Nadolski disputes this characterization of the update process and expectations. Nadolski testified that although Patient Care Coordinators were expected to update doctor information on an ongoing basis, they were not expected to fully complete the update until they were "tapped" to take a few days off from the field in order to concentrate on the update. *See* R. 28-1 at 298

6

(44:6-11), 320 (130:9–132:3). Nadolski testified that he was not "tapped" to do so until May 2013, shortly before he was fired. *See id.*

Long also testified that Nadolski expressed on several occasions that he felt overwhelmed by certain aspects of his job, and that the detail oriented tasks required of Patient Care Coordinators were not in his "wheelhouse." R. 28-1 at 77 (76:9-13), 79-80 (78:24–79:7), 82-83 (81:1–82:23). Although detail-oreinted tasks are not in his "wheelhouse," Nadolski admits that while working for ASM, he had a second job teaching a college course two evenings a week and also participated in a dramatic production during December 2012, including rehearsals in the evenings.[1] Long testified that these activities distracted Nadolski from his work. *See* R. 28-1 at 125 (124:1-3), 179 (178:18-24). Nadolski disputes, however, that these activities detracted from his job performance, pointing to his favorable performance reviews as evidence to the contrary. *See* R. 34 ¶¶ 28, 31-32. Nadolski also states in his affidavit that Long and ASM knew of his second job when he was hired. R. 34-6 ¶ 9. Further, ASM does not dispute that Nadolski requested and was granted permission to take time off to participate in the play.

**Analysis**

Nadolski alleges that ASM violated the ADA when it (1) failed to accommodate his ADHD, and (2) fired him because of his ADHD. ASM's primary argument is that Nadolski is not disabled for purposes of the ADA. Since both of Nadolski's claims (failure to accommodate and discriminatory firing) require

---

[1] *See* R. 28-1 at 251 (141:7-9) ("We had set rehearsals throughout the week . . . which were a couple hours at night.")

7

Nadolski to be disabled for the purposes of the ADA, the Court addresses that issue first.

I.  **Disability**

Under the ADA the "term 'disability' means, with respect to an individual, (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Further, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication . . . [or] reasonable accommodations." 42 U.S.C. § 12102(4)(E)(i)(I) and (III).

Nadolski alleges that his ADHD "substantially limits" his ability to think, concentrate, and work.[2] He argues that his substantial limitation in these areas is shown by the fact that he "receives ongoing medical treatment and uses daily medications to ameliorate the effects of the ADHD." R. 32 at 3. Nadolski also points

---

[2] Federal regulations list thinking, concentrating, and working as "major life activities" for the purposes of the ADA. *See* 29 C.F.R. § 1630.2(1)(i) (2011).

8

to his evaluation by Nurse Hahn, in which Nurse Hahn reported that Nadolski stated that:

> he has trouble with detailed work. He often makes a lot of mistakes due to carelessness. He has trouble sitting still. He is always fidgety and moving his feet. He has unusual difficulty staying focused [on] boring or repetitive tasks. . . . He states that . . . it is hard for him to prioritize work and chores that almost anything can get his mind off what he is doing and is easily distracted by events around him such as noise or movement. He needs written reminders to get himself to do his activities or tasks.

R. 34-8 at 2-3. In an affidavit prepared for this motion, Nadolski also states as follows:

> 4. The medicine does not completely ameliorate my ADHD symptoms as described above, however it does reduce the impact of the condition such that I can focus and concentrate for longer periods of time, not as easily distracted but still am distracted by noises, lights, etc., and still have difficulty prioritizing and finishing projects.
>
> 5. When the medicine wears off which is about 5pm, my condition worsens and does so each hour thereafter. As I stated in my deposition at night my condition 'gets pretty difficult to deal with.' (DN Feb. p. 12). I lose the ability to concentrate for any sustained period of time making it difficult to complete projects. It takes more time than the average person to complete a project. The reason, in part, is that I am easily distracted by other tasks. If while I am doing one task, another comes to mind I am likely to stop the project I am working on and start with the other project. It is difficult to prioritize the projects so I jump from one to the other.

R. 34-6 at 3.

This evidence is insufficient for a reasonable jury to conclude that Nadolski is "substantially limited" in his ability to think or concentrate. Certainly, this evidence

establishes that Nadolski suffers from an impairment to his thinking and concentration. But this impairment does not "substantially limit" him as compared to the general public. Nadolski testified and stated that he takes medication and that it begins to wear off at 5:00 p.m., causing his symptoms to become progressively worse through the evening. Yet, Nadolski is able to prepare for and teach college courses in the evening, and was able to rehearse and perform a play in the evening over the course of a month. Teaching college courses and performing in a play are certainly activities that require a significant level of thinking and concentration. Nadolski contends that "defendant does not know if the accomplishments were done with ameliorative effects of the medications that Plaintiff takes to reduce the effects of his ADHD." R. 32 at 4. But the only evidence in the record on this issue is Nadolski's own testimony that his medication begins to wear off at 5:00 p.m. and his symptoms get progressively worse. Thus, Nadolski's ability to engage in these activities after his medication has worn off belies his testimony that he is "substantially limited" in his ability to think and concentrate.

Nadolski correctly points out that federal regulations provide that "[i]n determining whether an individual has a disability . . . the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 29 C.F.R. § 1630.2(j)(4)(iii). "For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in

10

the general population." *Id.* But Nadolski has not presented any evidence that it was more difficult for him to engage in his teaching and dramatic activities compared to the general public. There is no evidence that Nadolski had to expend greater time or effort in order to teach his classes or prepare for his role in the play. Absent such evidence, Nadolski's ability to engage in such activities serves to undermine his testimony that he is "easily distracted" and has "difficulty . . . finishing projects." Teaching a college course and memorizing a role in a play are complicated activities that require the ability to focus on particular tasks. The evidence in the record demonstrates that Nadolski was able to sufficiently focus on complicated activities after 5:00 p.m. without the assistance of his medication and without any greater difficulty than the average person.

Nadolski also argues that his ADHD substantially limits his ability to "work." To show that an impairment "substantially limits" an individual "in working, the individual can . . . show[] that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." *See* Appendix to 29 C.F.R. § 1630. However, "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." *Id.*

Nadolski contends that his impairment substantially limits his ability to perform "jobs [that] involve record keeping . . . on a timely basis." R. 32 at 5. The evidence does not support this characterization of the effect Nadolski's impairment

11

has on his ability to work. Nadolski admits that the "difficulty [he] experienced while working for [ASM] was *not* inputting data into the [database] as he knew how to do that. The difficulty was the repetitive nature of the task and the need to do it by a deadline caused by his ADHD." R. 33 ¶ 7 (emphasis added). But it was Nadolski's decision to leave a week's worth of data entry until the end of the weekly reporting period that transformed the task into one with a "repetitive nature." If Nadolksi had logged his activity after each meeting as other Patient Care Coordinators did, or even logged his activity at the end of each day, the task would not have been "repetitive" in nature. To the extent that Nadolski's impairment substantially limits his ability to perform repetitive record-keeping tasks, that impairment is only at issue here by his own doing.

Therefore, the evidence in the record is insufficient for a reasonable jury to find that Nadolski was disabled for purposes of the ADA, and ASM is entitled to summary judgment on both Nadolski's failure to accommodate and discrimination claims. Nadolski's claims fail for additional reasons, which the Court will address in the interest of completeness.

## II. Failure to Accommodate

Even if Nadolski's ADHD constituted a disability for purpose of the ADA (which it does not), the evidence is insufficient for a reasonable jury to find that ASM failed to accommodate that disability. Nadolski alleges that ASM failed to reasonably accommodate his inability "to timely complete the weekly [database]

reports," R. 26 ¶ 16, because Long initially granted and then revoked an extension of the reporting deadline for Nadolski.

"In order to establish a claim for failure to accommodate, a plaintiff must show that . . . the employer was aware of his disability[,] and . . . the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 682 (7th Cir. 2014). "Reasonable accommodations may include: (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 573-74 (7th Cir. 2001) (quoting 42 U.S.C. § 12111(9)).

The problem with Nadolski's argument is that the evidence shows that he did not require an accommodation to timely log his activity in the database in the first place. Nadolski testified that his difficulty with timely logging his activity arose because he habitually attempted to log a week's worth of activity at the last minute before the Monday night deadline. Nadolski testified that this was difficult for him because his medication begins to wear off at 5:00 p.m. and his condition becomes progressively worse after that. But ASM never required Nadolski to log his acitivty within this narrow time window. Rather, Nadoloski was free to log his activity whenever suited him best during the week. This freedom to set his own schedule is

13

the ultimate accommodation for Nadolski's impairment. In fact, ASM encouraged Nadolski to log his activity daily, or immediately after meeting with a doctor—a routine which would have avoided triggering Nadolski's impairment. Nadolski testified that this was not possible for him because there were "too many distractions" in the parking lots outside the offices of the doctors he visited. The Court finds this explanation entirely unreasonable and not one a reasonable jury would credit. But even if the Court were to credit Nadolski's explanation, it does not explain why Nadolski could not find a less distracting location to log his activity. There is no evidence that ASM's policies prevented Nadolski from devising a process for logging his activity in a manner that would avoid the need to spend several consecutive hours logging information after his medication lost its effectiveness for the day.

Instead of showing that ASM failed to accommodate Nadolski's impairment, the evidence indicates that Nadolski was unwilling to complete his data entry responsibilities at any point in time other than at the very end of the weekly reporting period after his medication had begun to wear off. Nadolski's procrastination created self-imposed pressure to meet ASM's deadline—a deadline that was otherwise highly accommodating to Nadolski's personal schedule. Despite the fact that his impairment made his chosen routine difficult for him, Nadolski testified that he was unwilling to log his activity on weekends because he had been promised that he would not have to work more than 40 hours a week and that ASM "does not own me." R. 28-1 at 291 (17:5). Additionally, Nadolski admits that he

14

spent a substantial amount of time on his second job teaching college courses and participating in a play that he prioritized above ensuring that his marketing activity was timely logged. *See id.* at 291-92 (16:17–18:6). [3] This evidence

---

[3] Specifically, Nadolski testified as follows:

> Q. Again, before we get to this – so is it your testimony that it would take up to five hours to, perhaps, complete [the data entry], and, so, you would get home Monday evening, and it may take you all that evening, maybe from 6:00 to 12:00 or whatever to input [the data]?
> A. Yeah.
> Q. Is there some reason you couldn't have done that Sunday evening?
> A. Yes, there is.
> Q. Is there some reason that your ADHD prevented you from inputting into [the database] on Sunday evening?
> A. Here's the thing. With Sunday evening – the company does not own me and my time, okay? And when I had been originally brought in and on board, I was told it was a 40-hour work week, and that is what we're doing, et cetera, et cetera. I have a life. I had a crumbling marriage I was dealing with on a regular basis, which was very stressful. I don't know if you know how distressful that – it was really, really tough. So I had a lot of life distractions, and, again, the company doesn't own me during those off times. I might as well sleep there.
> Q. So can you answer the question? So is that to say your ADHD did not prevent you from inputting this information on Sunday?
> A. No, sir. As a matter of fact, it says the opposite. It says, because I had other life tasks, such as my marriage, and my now ex-wife to deal with, as well as obligations, that I had to deal with that. The Center For Sleep Medicine was not the only thing in my life, and my ADHD did prevent me from entering that information because of the distractions therein.
> Q. And did your ADHD prevent you from inputting the information on Saturday evening?
> A. Same answer.

demonstrates that Nadolski *chose* not to log his activity in a manner that would enable him to avoid engaging in a repetitive task. Since the evidence indicates that Nadolski could easily have satisfied ASM's expectations without an accommodation, ASM's duty to accommodate was never triggered. See *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 852 (7th Cir. 2015) ("A plaintiff cannot state a failure to accommodate claim if she was able to perform all essential functions of her job without regard to her physical or mental limitations. Thus, an employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job."). Therefore, ASM is entitled to summary judgment on Nadolski's failure to accommodate claim.[4]

### III. Discrimination

There is also insufficient evidence for a reasonable jury to find that Nadolksi was fired *because* of his ADHD. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) ("[W]hether a plaintiff proceeds under the direct or indirect method of proof, the ultimate standard is the same: the plaintiff must demonstrate that the employer would not have made the adverse employment decision in question but for

---

> Q. Did your ADHD prevent you from inputting this information during any part of the weekend?
> A. During any part of the weekend, same answer.

[4] ASM also argues that there is insufficient evidence for a jury to conclude that Nadolski sought an accommodation for his ADHD, which is also an element of a failure to accommodate claim. ASM, however, does not dispute that Nadolski told Long about his ADHD, and Nadolski testified that Long agreed to extend Nadolski's reporting deadline. This is sufficient evidence for a reasonable jury to conclude that ASM was aware that Nadolski thought he was entitled to an accommodation for his ADHD.

his membership in a protected class."). The only evidence Nadolski cites to support such a finding is that Sobczak, a fellow Patient Care Coordinator, also had difficulty timely logging his activity in the database, but was not fired. Sobczak is not an adequate comparator, however, because he began recording his activity in the database in a timely fashion once Long insisted that he do so. This occurred in the fall of 2012, around that same time that Long began to insist that Nadolski timely log his activity. Since Sobczak heeded Long's instructions in a timely fashion, whereas the evidence shows Nadolski continued to be late in logging his activity, ASM's failure to fire Sobczak is not evidence that it discriminated against Nadolski.

## Conclusion

For the foregoing reasons, ASM's motion for summary judgment, R. 27, is granted.

ENTERED

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: February 3, 2016

17